**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 09-cv-01578-CMA-MEH

CLEARY BUILDING CORP, A Wisconsin corporation,

Plaintiff,

v.

DAVID A. DAME, INC., an individual,

Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS CLAIMS

---

This is a trademark lawsuit alleging cybersquatting in violation of 15 U.S.C. § 1125(d), trademark infringment in violation of 15 U.S.C. § 1114, trademark dilution in violation of 15 U.S.C. § 1125(c), unfair competition in violation of 15 U.S.C. § 1125(a), and false advertising in violation of 15 U.S.C. § 1125(a). Plaintiff also alleges claims of common law trademark infringement, unfair and deceptive trade practices pursuant to Colo. Rev. Stat. § 6-1-105, defamation, trade disparagement, and breach of contract. This matter is before the Court on Defendant's Motion to Dismiss (Doc. # 8). Jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity). For the reasons stated below, the Court grants Defendant's Motion to Dismiss.

## I. BACKGROUND

### A. FACTS

For purposes of Defendant's Motion, all well-pleaded facts in the Complaint are assumed to be true, and all reasonable inferences therefrom are drawn in the light most favorable to Plaintiff. Accordingly, the following facts must be taken as true:

Plaintiff, Cleary Building Corp. ("Clearly Building"), a Wisconsin corporation, is a leading manufacturer and builder of pre-engineered structures. (Doc. # 1, ¶ 2)

Cleary Building owns multiple United States Trademarks (collectively the "Cleary Building Marks") which clearly identify Cleary Building's products from those made and sold by others. The Cleary Building Marks are famous. As part of Cleary Building's commitment to service and excellence, and to clearly identify its products from those made and serviced by another, Cleary Building identifies its blueprint construction plans and products with its marks. (*Id.,* ¶¶ 14, 15)

Defendant, David A. Dame ("Dame"), contracted with Cleary Building for the construction of a 50' x 100' x 18' 8" post frame building (the "Dame Building"). On or about December 10, 2008, Cleary Building began construction of the Dame Building. On or about December 17, 2008, the project was put on hold for the holidays. (*Id.,* ¶¶ 17, 19, 20)

After the holiday work break, a Cleary Building crew returned to the construction site to resume work. On or about January 14, 2009, Dame raised concerns about the

construction and refused to allow Cleary access to the construction site until Cleary agreed to address these concerns. (*Id.,* ¶ 21)

On or about January 19, 2009, Dame again refused Cleary Building access to the construction site for similar reasons. A Cleary representative and Dame walked through the site on or about February 2, 2009, and created a list of issues to be addressed. Cleary Building was willing to work with Dame to address his concerns. (*Id.,* ¶¶ 21-22)

As work progressed, on or about March 4, 2009, Dame and Cleary Building performed a second walk-through on the site and created a second list of problems to be addressed. (*Id.,* ¶ 23)

At the end of March and beginning of April 2009, Cleary Building attempted to contact Dame to do a final walk through and list of corrections. To date, Dame has refused to allow Cleary Building access to the Dame Building to address final issues. (*Id.,* ¶ 24)

At least as early as May 27, 2009, Dame was advertising the Dame Building for sale in at least two online advertisements. In each advertisement, Dame provided direct links to his website www.mycleary building.com (the "Dame Website") and encouraged potential buyers to go to the Dame Website. (*Id*., ¶ 30)

In turn, at least as early as May 27, 2009, the Dame Website was using Cleary Building's blueprint plans, including at least one Cleary Building Mark, as a background

to the opening page. Dame's use of Cleary Building's blueprint plans and at least one Cleary Building Mark were without permission. (*Id*., ¶¶ 27, 28)

On May 29, 2009, Dame posted a link to the Dame Website on an online bulletin board where others were discussing the quality of Clearly Building products. Readers accessed photographs of the Dame Building and commented that, while some defects were merely cosmetic, Cleary Building's installers appeared to have done a "poor job" overall and that the roof attachment was "horrible." After viewing the pictures on the Dame Website, one reader suggested that Dame "get a lawyer," while another opined that "Unless you live in the desert and never get rain or snow the roof will give you fits until you finally replace it." (*Id*., ¶ 29; Doc. # 1-3; Doc. # 1-4)

In addition, the Dame Website published, and/or is currently publishing, false and/or misleading statements about Cleary Building and/or the Dame Building. For example, Dame has falsely represented to the public that Cleary Building "declared the project finished" while, in fact, Dame refuses to allow Cleary Building access to the Dame Building to address final issues. (*Id.,* ¶¶ 31, 24)

**B. PROCEDURAL HISTORY**

Plaintiff filed its Complaint in this case on February 2, 2009 (Doc. # 1). Defendant filed its Motion to Dismiss on August 31, 2009 (Doc. # 8), Plaintiff responded on September 21, 2009 (Doc. # 13), and Defendant replied on October 20, 2009 (Doc. # 17).

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). "A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

The Supreme Court recently retired "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *abrogated by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court replaced the *Conley* standard with a new standard in *Twombly*, which "prescribed a new inquiry for [courts] to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Twombl*y, 127 S.Ct. at 1974). The Court explained that "a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." *Id*. (internal citation and brackets omitted). "Thus, the mere metaphysical

possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Id.*

In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits, *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 964-65 (10th Cir. 1994), and documents incorporated into the complaint by reference, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1180 (10th Cir. 2007). "[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (internal quotation omitted).

## III. ANALYSIS

Plaintiff's Complaint contains ten claims for relief. The first five claims involve federal questions. Specifically, Plaintiff alleges claims for relief under the following federal statutes: (1) cybersquatting, 15 U.S.C. § 1125(d); (2) trademark infringement, 15 U.S.C. § 1114; (3) trademark dilution, 15 U.S.C. § 1125(c); (4) unfair competition, 15 U.S.C. § 1125(a); and (5) false advertising, 15 U.S.C. § 1125(a). The remaining five claims are: (6) common law trademark infringement; (7) unfair and deceptive trade practices under Colo. Rev. Stat. § 6-1-105; (8) defamation; (9) trade disparagement; and (10) breach of contract. The latter claims are all state law claims over which this Court has jurisdiction pursuant to both 28 U.S.C. § 1367 (supplemental jurisdiction) and

28 U.S.C. § 1332 (diversity jurisdiction).[1] Defendant's Motion to Dismiss requests dismissal of only the first seven claims, and therefore only these claims are discussed below.

**A. FEDERAL CLAIMS**

1. Cybersquatting Pursuant to 15 U.S.C. § 1125(d)

Plaintiff alleges that Defendant violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), by registering and using the Dame Website (www.myclearybuilding.com) with a bad faith intent to profit.

"The ACPA was enacted in 1999 in response to concerns over the proliferation of cybersquatting - the Internet version of a land grab." *Virtual Works, Inc. v. Volkswagen of America, Inc*., 238 F.3d 264, 267 (4th Cir. 2001). It was enacted because then-existing law did not expressly prohibit the practice of cybersquatting, and cybersquatters had begun to insulate themselves from liability under the Federal Trademark Dilution Act, 15 U.S.C. § 1125. *Id.*

In the Senate Report accompanying the ACPA, cybersquatters are defined as those who: (1) "register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks;" (2) "register well-known marks as domain names and warehouse those marks with the hope of selling them to the highest bidder;" (3) "register well-known marks to prey on consumer confusion by

1 Defendant in his Motion to Dismiss argues that, absent a valid federal question, the elements of diversity jurisdiction under 28 U.S.C. § 1332 are not met because Plaintiff's damages would not exceed $75,000. This Court will address this after consideration of the merits of the federal question claims.

misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site;" (4) "target distinctive marks to defraud consumers, including to engage in counterfeiting activities." S. Rep. No. 106-140, at 5-6 (1999) (Conf. Rep.).

Pursuant to the ACPA, a cybersquatter is potentially liable to the owner of a protected mark if that person:

> (i) has a bad faith intent to profit from the mark. . . ; and
> (ii) registers, traffics in, or uses a domain name that-
>> (I) in the case of a mark that is distinctive . . . , is identical or confusingly similar to that mark;
>> (II) in the case of a famous mark. . . , is identical or confusingly similar to or dilutive of that mark; or
>> (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).

Therefore to defeat Defendant's Motion to Dismiss the ACPA claim, the Complaint and attached exhibits must contain enough facts for this Court to find it plausible (1) that the Cleary Building Marks were distinctive at the time of registration of Plaintiff's domain name, (2) that the domain name registered by Defendant, www.myclearybuilding.com, is identical or confusingly similar to the trademarks, and (3) that Defendant used or registered the domain names with a bad faith intent to profit. *See Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Res.,* 527 F.3d 1045, 1057 (10th Cir. 2008).

In this case, Defendant concedes for purposes of this Motion that the Cleary Building Marks are famous, and thus the first element of the ACPA claim is met. As to the second element, for purposes of the Motion to Dismiss, the Court finds that it is

plausible that "www.myclearybuilding.com," which only adds the modifier "my," is confusingly similar to the CLEARY word mark and logo. *See, e.g.,* McCarthy on Trademarks § 25:78 ("The addition in the accused domain name of generic or descriptive matter to the mark will usually not prevent a finding of confusing similarity."); *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201 (6th Cir. 2004) (accused domain name "foradodge.com" is confusingly similar to the trademark DODGE for autos).

As to the third element, Plaintiff argues that it has pled facts sufficient to state a plausible claim that Defendant had a bad faith intent to profit. Plaintiff alleges the following facts to show Defendant's bad faith intent to profit: Defendant's posting of false and misleading statements about Cleary Building; the apparent misrepresentation of the number of times the Dame Website has been accessed; the use of the Dame Website domain to attempt to gain an unfair and illegitimate advantage in negotiating with Plaintiff; and, offering to remove the Dame Website if Plaintiff meets Defendant's demands. (Doc. # 1, ¶¶ 31, 36)

In its report on the ACPA, the Senate Judiciary Committee distilled the crucial elements of bad faith to mean an "intent to trade on the goodwill of another's mark." S. Rep. No. 106-140, at 9 (1999) (Conf. Rep.). The ACPA enumerates nine nonexclusive factors to assist the court in determining whether the use of a trademark involves a bad faith intent to profit.[2] 15 U.S.C. § 1125(d)(1)(B)(I). "These factors are

2 Under 15 U.S.C. § 1125 (d)(1)(B)(I), a court may consider factors such as:
(I) the trademark or other intellectual property rights of the person, if any, in the domain name;
(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

designed to balance the property interests of trademark owners with the legitimate interests of Internet users and others who seek to make lawful uses of others' marks, including for purposes such as comparative advertising, comment, criticism, parody, news reporting, fair use, etc." H.R. Rep. No. 106-412, at 10 (1999) (Conf. Rep.).

In *Utah Lighthouse Ministry*, the defendant Wyatt registered several domain names that were similar to trademarks of the Utah Lighthouse Ministry ("UTLM") and the names of UTLM's founders. 527 F.3d at 1048-49. Wyatt then created a parody website that mocked the UTLM and directed visitors to his own group's site. *Id.* The Tenth Circuit evaluated the bad faith intent to profit element using the list of nonexclusive factors provided in the ACPA statute. *Id.* at 1058. The Court did not consider all factors

---

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

"because several of the factors readily defeat an inference that the Defendants intended to profit by using domain names similar to UTLM's trademark." *Id*. The Court stated:

> The quintessential example of a bad faith intent to profit is when a defendant purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price. A defendant could also intend to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's. *Id.*

This Court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted. *Dubbs*, 336 F.3d at 1201. Therefore, it is not appropriate for this Court to weigh the factors. However, it is appropriate to look at the unique factors in this case to determine whether Plaintiff has pled facts sufficient to state a plausible claim that Defendant had a bad faith intent to profit.

Under factor IV, the Court considers "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name." 15 U.S.C. § 1125(d)(1)(B)(I)(IV). As both the Fifth and Sixth Circuits point out, the disgruntled customer who opens a "gripe site" under the domain name of a business that is complained about is not a "cybersquatter" and is not violating the ACPA. *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806 (6th Cir. 2004) (affirming dismissal of ACPA case where the defendant created website lucasnursery.com to share her story and complaints about Lucas Nursery, plaintiff's business); *Accord TMI, Inc. v. Maxwell*,

368 F.3d 433 (5th Cir. 2004) (finding no ACPA violation where the defendant created website to air his complaints about plaintiff's salesman). As the Sixth Circuit observed:

> The paradigmatic harm that the ACPA was enacted to eradicate – the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owner of the mark – is simply not present [in a disgruntled customer's Web site.] One of the ACPA's main objectives is the protection of consumers from slick internet peddlers who trade on the names and reputations of established brands. The practice of informing fellow consumers of one's experience with a particular service provider is surely not inconsistent with this ideal.

*Lucas Nursery and Landscaping*, 359 F.3d at 810.

In this case, when viewing the facts in a light most favorable to Plaintiff and drawing all reasonable inferences in its favor, it is clear that Defendant is making a noncommercial or fair use of Plaintiff's marks. The exhibits to the Complaint show that the Dame Website is nothing more than a "gripe site." The Defendant is using the site to tell his story and make his complaints and grievances with Plaintiff known. The Dame Website is very similar to what was described in *Lucas Nursery* and *TMI*, which the Tenth Circuit favorably cited in *Utah Lighthouse*. 507 F.3d at 1058. This is a valid exercise of free speech rights, and not the type of harm that the ACPA was designed to protect.

Now turning to factor V, the Court considers "the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain

or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." 15 U.S.C. §1125(d)(1)(B)(I)(V).

In *Utah Lighthouse,* the Tenth Circuit affirmed the district court's finding that the defendant Wyatt's website did not satisfy this factor because his website created no likelihood of confusion as to its source, affiliation, or endorsement. 527 F.3d at 1058. In that case, screen shots of Wyatt's website showed that the design elements of his website were very similar to those of the plaintiff UTLM. *Id.* at 1049. For example, the UTLM website stated: "Welcome to the Official Website of the Utah Lighthouse Ministry, founded by Jerald and Sandra Tanner." In comparison, the Wyatt website stated: "Welcome to an official website *about* the Utah Lighthouse Ministry, **which was** founded by Jerald and Sandra Tanner." *Id.* (emphasis added). Wyatt's website did not have any disclaimer that it was not associated with UTLM. *Id.*

Similarly in the instant case, likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site is not plausible. Like the Wyatt website in *Utah Lighthouse*, the Dame Website does not have any disclaimer stating that it is not associated with Plaintiff, however, it is clear from the screen shot of the Dame Website contained in the exhibits attached to the Complaint that it is not associated with Plaintiff. The title page says, "**My** NEW building **by** Cleary Building Corp," (emphasis added) and contains information about Defendant's experiences with Plaintiff regarding the Dame Building. Based on the similarity of these facts to those in *Utah Lighthouse*, it is simply not reasonable to conclude that someone viewing this

website would be confused as to the source, sponsorship, affiliation, or endorsement of this site.

Now turning to factor VI, the Court considers "the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct." 15 U.S.C. § 1125(d)(1)(B)(I)(VI).

In the instant case, Plaintiff alleges that Defendant registered the Dame Website to gain an unfair advantage in negotiating with Plaintiff, and that Defendant offered to take down the Dame Website as part of a settlement. (Doc. # 1, ¶ 36). The facts of this case are very similar to those in *Mayflower Transit, LLC v. Prince*, 314 F. Supp.2d 362 (D.N.J. 2004). In *Mayflower Transit,* an individual registered several domain names that appeared to be variations of the plaintiff's mark and posted a website describing his frustration with the way the company handled his possessions during a move. The Court in that case stated it did not believe that the plaintiff's allegations of the defendant's intent to use the website as a "bargaining chip" to exert settlement pressure on the plaintiff constituted an offer to sell. 314 F. Supp.2d at 369. Further, in the instant case, Plaintiff alleges that Defendant offered to **remove** the Dame Website, not **sell** it to Plaintiff.

These factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit. *See Lucas Nursery*, 359 F.3d at 811. Reviewing the exhibits attached to the Complaint,

Plaintiff has presented facts to suggest Defendant created his website to inform fellow consumers about his experiences with the Plaintiff's company, which he believed performed inferior work. The paradigmatic harm that the ACPA was enacted to eradicate – the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark – is not even alleged to be present here.

Based on the foregoing, this Court finds that Plaintiff has not pled sufficient facts to support a claim of cybersquatting.

2. Trademark Infringement Pursuant to 15 U.S.C. § 1114

Plaintiff alleges that Defendant's "unauthorized replication and commercial use of the CLEARY BUILDING Logo constitutes trademark infringement in violation of 15 U.S.C. § 1114." 15 U.S.C. § 1114 provides:

> (1) Any person who shall, without the consent of the registrant –
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark **in connection with the sale, offering for sale, distribution, or advertising of any goods or services** on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or **in connection with the sale, offering for sale, distribution, or advertising of goods or services** on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided. (Emphasis added.)

Therefore, in order to survive a motion to dismiss, a plaintiff must plead facts sufficient to state a plausible claim that Defendant used Plaintiff's mark "in connection

with any goods or services." *See Utah Lighthouse*, 507 F.3d at 1051-1052. This is commonly described as the commercial use requirement. *Id.* at 1051.

In *Utah Lighthouse*, where the defendant Wyatt created parody web sites with domain names similar to the Utah Lighthouse Ministry and directed visitors to his own group's site, the Court held Wyatt "did not use UTLM's trademark in connection with a sale of goods or services – but in connection with the expression of his opinion about UTLM's goods and services." 527 F.3d at 1053, *citing Bosley Medical Institute v. Kremer,* 403 F.3d 672, 679 (9th Cir. 2005).

The Tenth Circuit in *Utah Lighthouse* also delved into whether hyperlinking renders an otherwise noncommercial website subject to the Lanham Act. In reaching its conclusion, the Tenth Circuit relied heavily on the Ninth Circuit's decision in *Bosley.* In *Bosley*, the defendant Kremer was dissatisfied with a hair implant procedure he had received from Bosley Medical and created a website with the domain name "bosleymedical.com" to post negative information about Bosley Medical. *Id.* The website linked to another website also maintained by the defendant, which in turn linked to a newsgroup, *alt.baldspot*, which contained advertisements for Bosley Medical's competitors. *Id.* The Ninth Circuit affirmed the district court's ruling that the defendant's use was not "in connection with the sale of goods or services" because the link to Bosley Medical's competitors was too roundabout and attenuated. *Id.* at 677. The Court stated, "Kremer is not Bosley's competitor; he is their critic. His use of the Bosley mark is not in connection with a sale of goods or services – it is in connection with the expression of his opinion about Bosley's goods and services." *Id.* at 676-677.

In the instant case, Plaintiff asserts that Defendant's use was "in connection with the sale of goods or services" because: (1) Defendant advertised the sale of the Dame Building in at least two online advertisements; (2) in each of these online advertisements Dame included direct links to the Dame Website, which included at least one Cleary Building Mark without authorization; and (3) the Dame Website contained false and/or misleading statements about Cleary Building and/or the Dame Building. (Doc. # 1, ¶¶ 15, 27, 30)

In this case, however, even accepting all of these facts as true, the Court cannot draw a reasonable inference that the defendant used the plaintiff's mark "in connection with any goods or services." In *Utah Lighthouse*, *Bosley*, and this case, the offending websites offered critical commentary about the trademark owner, and the use of the trademark was separated from any goods or services offered for sale. The Dame Website does not even link to the online advertisements. The online advertisements link to the Dame Website. This is "too roundabout and attenuated." The Defendant is Plaintiff's critic, and he is simply expressing his opinion about Defendant's goods and services.

Further, the Lanham Act is intended "to protect the ability of consumers to distinguish among competing producers," *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 774, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), not to prevent all unauthorized uses. The First and Ninth Circuits have emphasized that trademark rights cannot be used "to quash an unauthorized use of the mark by another who is communicating

ideas or expressing points of view." *L.L.Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 29 (1st Cir. 1987); *Bosley*, 403 F.3d at 675.

For the foregoing reasons, this Court finds that Plaintiff has not pled sufficient facts to support a claim of trademark infringement.

3. Trademark Dilution Pursuant to 15 U.S.C. § 1125(c)

Plaintiff alleges that Defendant violated 15 U.S.C. § 1125(c) when Defendant "commenced use of Cleary Building's Marks and www.myclearybuilding.com in a way that was and is likely to cause dilution by tarnishment . . . ." 15 U.S.C. § 1125(c) provides that "the owner of a famous mark . . . that is distinctive . . . shall be entitled to an injunction against another person who . . . commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment . . . ."

Courts interpreting the trademark dilution statute have found it roughly analogous to the "in connection with" the sale of goods and services requirement of the trademark infringement statute. *See, e.g.*, *Bosley,* 403 F.3d at 676. Therefore, "commercial use" of the mark is a requirement to state a claim for trademark dilution. To further underscore this point, the Federal Trademark Dilution Act expressly exempts "noncommercial use" of a mark from liability. 15 U.S.C. § 1125(c)(4)(B).

Because "commercial use" of the mark is a requirement for trademark dilution, and as stated above, Plaintiff has not pled facts sufficient to meet this requirement, this Court finds that Plaintiff has not pled facts sufficient to support a claim of trademark dilution.

4. Unfair Competition Pursuant to 15 U.S.C. § 1125(a)

Plaintiff alleges that Defendant is engaged in unfair competition in violation of 15 U.S.C. § 1125(a). 15 U.S.C. § 1125(a) provides:

> 1) Any person who, on or **in connection with any goods or services**, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. (Emphasis added.)

Courts addressing claims of both trademark infringement and unfair competition, address the claims together because they have virtually identical elements and both require "commercial use." *See Utah Lighthouse,* 527 F.3d at 1050 (finding no unfair competition because the defendant's use of the plaintiff's trademark was not in connection with any goods or services)*; Donchez v. Coors Brewing Co.,* 392 F.3d 1211, 1219 (10th Cir. 2004)*; cf. Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Heaton Distrib. Co. v. Union Tank Car Co.,* 387 F.2d 477 (8th Cir. 1967) ("Trademark infringement is but part of broader law of unfair competition; and facts supporting suit for infringement and one for unfair competition are substantially identical.").

As stated above, Plaintiff has not pled facts sufficient to meet the "commercial use" requirement. Similarly, this Court finds that Plaintiff has not pled facts sufficient to support a claim of unfair competition.

5. False Advertising Pursuant to 15 U.S.C. § 1125(a)

Plaintiff alleges Defendant is engaged in false advertising in violation of 15 U.S.C. § 1125(a). This is the same statute cited above under the Unfair Competition heading. For the same reasons stated in that section, this Court finds that Plaintiff has not pled facts sufficient to support a claim of false advertising.

## B. STATE LAW CLAIMS

Dismissal of all the claims supporting federal question jurisdiction gives rise to the question of whether this Court should exercise supplemental jurisdiction over the remaining state law claims or whether this Court has diversity jurisdiction over the remaining state law claims.

28 U.S.C. § 1367(c)(3) provides that the Court "may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." In determining whether to exercise its discretion to exercise supplemental jurisdiction in these circumstances, the Court must consider the values of judicial economy, convenience, fairness, and comity. *City of Chicago* v. *International College of Surgeons,* 522 U.S. 156, 173, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997). Because this case is at its inception, these factors weigh in favor of not exercising supplemental jurisdiction over the remaining state law claims.

Defendant claims that this Court does not have diversity jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1332 because it is not remotely plausible that the amount in controversy exceeds $75,000. A complaint may not be dismissed for failure to plead the required amount in controversy unless the defendant can establish "to a legal certainty" that the claim is really for less than the jurisdictional amount; otherwise the plaintiff's good faith allegations of the amount in controversy will control. *McPhail v. Deere & Co.,* 529 F.3d 947, 953 (10th Cir. 2008), *citing St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289 (1938); *Woodmen of World Life Ins. Soc'y v. Manganaro,* 342 F.3d 1213, 1216-17 (10th Cir. 2003).

In the instant case, Defendant does not dispute that Plaintiff's trade disparagement, defamation, and breach of contract claims are properly pled. Based on Defendant's own representations, the Dame Website has been accessed a substantial number of times. This suggests a possibility that damages for false and defamatory conduct are potentially very large. Again, it is not Plaintiff's obligation to prove its damages claim, it is Defendant's burden to prove to a legal certainty that the statutory minimum cannot be met.

Based on the foregoing, this Court finds that Defendant has failed to demonstrate to a legal certainty that Plaintiff's damages do not exceed $75,000. Therefore, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 over the remaining state law claims.

1. Common Law Trademark Infringement (Claim 6)

Plaintiff alleges that Defendant is infringing and tarnishing Plaintiff's common law trademark rights. The elements of common law trademark mark infringement are similar to those required to prove unfair competition under § 43(a) of the Lanham Act. *See, e.g., Donchez*, 392 F.3d at 1219. Among other things, a plaintiff must establish a protectable interest in its mark, the defendant's use of that mark in commerce, and the likelihood of consumer confusion. *Id.; See also Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1248 (11th Cir. 2002).

For the reasons stated in the unfair competition heading above, Plaintiff has failed to plead facts sufficient to state a claim for common law trademark infringement.

2. Unfair and Deceptive Trade Practices pursuant to Colo. Rev. Stat. § 6-1-105 (Claim 7)

Plaintiff alleges in its Complaint that Defendant's "unfair, false, misleading and deceptive acts and practices have affected commerce and the consuming public in the state of Colorado . . . ." Defendant is "therefore engaged in unfair and deceptive trade practices in violation of COLO. REV. STAT. § 6-1-105."

To state a claim for relief under the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-105, a plaintiff must plead facts sufficient to show that: (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (3) the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a

legally protected interest; and (5) the challenged practice caused the plaintiff's injury. *Brodeur v. American Home Assur. Co.*, 169 P.3d 139, 155 (Colo. 2007).

This Court must construe these terms in accordance with Colorado rules of statutory construction. *United Rentals Northwest, Inc. v. Yearout Mechanical, Inc.,* 573 F.3d 997, 1001 (10th Cir. 2009). As such, the Court should determine and give effect to the legislature, looking first to the plain and ordinary meaning of the statutory language. *People v. Madden,* 111 P.3d 452, 457 (Colo. 2005). Considering the plain and ordinary meaning of the language of element 2 – "in the course of defendant's business, vocation, or occupation" – it is apparent that this language is intended to apply to regular commercial activity. Defendant here is selling ONE used post frame building. It is not his business, vocation, or occupation to sell post frame buildings. As such, Plaintiff has failed to demonstrate that the second element is present because Defendant's actions did not occur **in the course of defendant's business, vocation, or occupation**. For the foregoing reason, Plaintiff has failed to plead facts sufficient to establish a claim for Unfair and Deceptive Trade Practices.

## IV. CONCLUSION

Based on the foregoing, the Court ORDERS that Defendant's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. # 8) is GRANTED. Accordingly, Plaintiff's First, Second, Third, Fourth, Fifth, Sixth and Seventh claims

for relief are DISMISSED WITH PREJUDICE. The Court retains jurisdiction over Plaintiff's Eighth, Ninth and Tenth Claims for Relief pursuant to 28 U.S.C. § 1332.

DATED: December __1__, 2009

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge